```
         IN THE UNITED STATES DISTRICT COURT FOR THE
                  EASTERN DISTRICT OF OKLAHOMA
```

RONALD P. WALSWORTH,            )
                                )
            Plaintiff,          )
                                )
v.                              )        Case No. CIV-07-246-FHS
                                )
MICHAEL J. ASTRUE,              )
Commissioner of Social          )
Security Administration,        )
                                )
            Defendant.          )

### REPORT AND RECOMMENDATION

Plaintiff Ronald P. Walsworth (the "Claimant") requests judicial review of the decision of the Commissioner of the Social Security Administration (the "Commissioner") denying Claimant's application for disability benefits under the Social Security Act. Claimant appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Claimant was not disabled. For the reasons discussed below, it is the recommendation of the undersigned that the Commissioner's decision be REVERSED and REMANDED for further proceedings.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . ." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act "only if his physical or mental impairment or

impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . ." 42 U.S.C. §423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. *See*, 20 C.F.R. §§ 404.1520, 416.920.[1]

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. Hawkins v. Chater, 113 F.3d 1162, 1164 (10th Cir. 1997)(citation omitted). The term "substantial

---

[1] Step one requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. §§ 404.1510, 416.910. Step two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. 20 C.F.R. §§ 404.1521, 416.921. If the claimant is engaged in substantial gainful activity (step one) or if the claimant's impairment is not medically severe (step two), disability benefits are denied. At step three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to step four, where claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's step four burden is met, the burden shifts to the Commissioner to establish at step five that work exists in significant numbers in the national economy which the claimant – taking into account his age, education, work experience, and RFC – can perform. Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. *See generally,* Williams v. Bowen, 844 F.2d 748, 750-51 (10th Cir. 1988).

2

evidence" has been interpreted by the United States Supreme Court to require "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The court may not re-weigh the evidence nor substitute its discretion for that of the agency. Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 800 (10th Cir. 1991). Nevertheless, the court must review the record as a whole, and the "substantiality of the evidence must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); *see also*, Casias, 933 F.2d at 800-01.

### Claimant's Background

Claimant was born on January 10, 1959 and was 47 years old at the time of the ALJ's decision. Claimant completed his high school education as well as two semesters of college and vocational training. Claimant has worked in the past as a truck driver, terminal manager, dispatcher, general laborer, and electrician's helper. Claimant alleges an inability to work beginning July 3, 2003, due to a thoracic spinal stenosis requiring a seven level fusion with continued pain, bulging lumbar and cervical disks, right foot pain, adhesive capsulitis and impingement of the left shoulder, diabetes, cataracts, depression, pain disorder, and

adjustment disorder.

## Procedural History

On February 5, 2004, Claimant protectively filed for disability insurance benefits under Title II (42 U.S.C. § 401, *et seq.*). Claimant's application for benefits was denied initially and upon reconsideration. A hearing before ALJ Ralph L. Wampler was held on August 13, 2006 in Ardmore, Oklahoma. By decision dated October 13, 2006, the ALJ found that Claimant was not disabled at any time through the date of insurability. On June 13, 2007, the Appeals Council declined review of the ALJ's decision. Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481.

## Decision of the Administrative Law Judge

The ALJ made his decision at step five of the sequential evaluation. He determined that while certain of Claimant's medical conditions were severe, Claimant did not meet a listing, did not retain the residual functional capacity to perform his past relevant work, a significant number of jobs existed in the national economy which Claimant could perform at his level of restrictions. The ALJ also found Claimant had acquired work skills from his past relevant work which were transferable to other occupations.

## Errors Alleged for Review

Claimant asserts the ALJ committed error in failing to (1)

4

engage in a proper credibility analysis of Claimant's subjective pain complaints; (2) make a proper step five determination supported by substantial evidence; (3) arrive at supported RFC assessment; and (4) properly evaluate Claimant's mental impairments.

### Credibility Analysis

Claimant challenges the ALJ's analysis of his credibility. Claimant's back condition originated in September of 2002 when he fell from a truck fender. (Tr. 197-198). Claimant injured his lower back and right hip. Claimant was released to work in November of 2002 without restrictions with a diagnosis of a sacroiliac strain/sprain. (Tr. 234). When the pain continued, however, Claimant underwent an MRI on his back which revealed mild degenerative changes in the hip and degenerative changes at the L5-S1 level with a small tear and mild concentric bulging affecting both S1 nerve roots. (Tr. 208-209).

On December 14, 2002, Claimant fell about ten feet upon his back. Claimant returned to work with restrictions on January 7, 2003. (Tr. 119). On January 16, 2003, Claimant continued reporting radiating pain in his back. (Tr. 117). Further weight restrictions were added to Claimant's work limitations. (Tr. 118).

On February 11, 2003, Claimant underwent an MRI of his thoracic spine which revealed a T7-8 disk bulge mildly compressing the spinal cord. (Tr. 309). Claimant returned to work with

5

further restrictions. (Tr. 112-113). On March 4, 2003, Claimant was attended by Dr. Michael H. Wright, an orthopedic surgeon with radiating back pain and neck and left shoulder problems. Claimant was found to exhibit mild to moderate distress and diminished reflexes in his legs, although his mobility and sensation were intact. Dr. Wright limited Claimant to a maximum lifting of 10 pounds and prescribed steroid injections. (Tr. 299-300).

On March 10, 2003, Claimant was further restricted by Dr. Mark Gibbs to standing and walking for two hours in an 8 hour workday and lifting no more than 10 pounds. (Tr. 111). Claimant's restrictions continued through May of 2003. (Tr. 108). In May, Claimant's pain increased and Claimant experienced reduced cervical mobility in a visit to Dr. Wright. (Tr. 295).

On June 5, 2003, Claimant underwent an MRI. The testing showed small circumferential disc bulges at C5-6 and C6-7 with no annular tear or disc protrusion depicted. The ventral subarachnoid space was effaced anteriorly at C5-6. The remainder of the testing was unremarkable or within normal limits. (Tr. 289). Claimant reported to Dr. Wright that he continued to have wraparound thoracic pain which was not relieved by medications or injections. Claimant expressed a desire for surgical relief. Dr. Wright continued Claimant's restrictions and scheduled surgery. (Tr. 294).

On July 7, 2003, Claimant underwent surgery which included

fusion of the T5 through T11 levels with spinal cord decompression and the placement of posterior spinal instrumentation, bone grafting and the removal of a rib. (Tr. 274-276).

On July 23, 2003, Claimant returned to Dr. Wright. Claimant reported that the wraparound burning thoracic pain was completely resolved and reported improving numbness. Claimant took two Percocet, two OxyContin and two Valium per day but Dr. Wright sought to wean him from these medications. (Tr. 245). However, he continued on the same level of medications through August of 2003. (Tr. 216). Claimant remained under work restrictions and driving restrictions due to the level of his pain medication. (Tr. 243). Dr. Gibbs also continued restrictions upon Claimant's work through September of 2003. (Tr. 104).

On October 28, 2003, Claimant was attended by Dr. Brent N. Hisey, complaining of thoracic muscle spasms, left rib paresthesias, and lower back and leg pain. (Tr. 382). Dr. Hisey noted Claimant's motor function was 5/5 with only slight reduction in reflexes. Straight leg raising was positive only for muscle tightness. (Tr. 383). He recommended physical therapy and found Claimant to remain temporarily totally disabled. Id.

On October 30, 2003, Claimant went to his first physical therapy session at Ardmore Physical Therapy. He stated he had pain, spasms and numbness in his back and legs. He also reported that his symptoms were aggravated by sitting, which he could only

7

accomplish for 30 minutes at a time, bending, upper extremity activities, climbing stairs, rising from a chair. Claimant remained on OxyContin for pain management, cold packs, and reclining in a chair. The therapist found Claimant to have a guarded and generally slumped posture, reduced cervical, thoracolumbar, left shoulder, and right hip mobility, and positive straight leg raising testing. The therapist found Claimant to be "extremely limited in his overall function due to continued pain and limitation with motion." (Tr. 3240325).

From November 16 through 18, 2003, Claimant was hospitalized by Dr. Gibbs for opiate withdrawal after a recent change in his narcotic medications. (Tr. 205-206). In November and December of 2003, Claimant's physical therapist noted lumbar muscle spasms and tightness with limited thoracolumbar mobility. Claimant was noted for only being able to walk for 10 minutes. (Tr. 322-323). Dr. Gibbs continued to restrict Claimant's work. (Tr. 101).

On December 15, 2003, Claimant sought treatment from a pain management specialist, Dr. A.E. Moorad. Dr. Moorad noted Claimant exhibited 40 percent decrease in his thoracic mobility and decreased lumbar mobility. He also found Claimant suffered from surgery related chronic pain syndrome and spasms. Dr. Moorad discontinued OxyContin and prescribed other medications and a TENS unit. (Tr. 332-334).

On December 29, 2003, Claimant was noted to have regressed

8

during a physical therapy evaluation with a guarded gait, slumped posture, and limited exercise tolerance. (Tr. 321). On January 14, 2004, Claimant continued to report muscle spasms and numbness in his left hand and pain while driving. Claimant's progress was noted to have regressed. (Tr. 320). On January 20, 2004, Claimant continued pain management with Dr. Moorad, reporting severe muscle spasms while driving and continued back pain with decreased mobility. (Tr. 330).

On March 25, 2004, Claimant continued to report muscle spasms and pain in his thoracic spine, left side, neck and left shoulder. Claimant's cervical, lumbar, and left shoulder mobility were significantly limited even though his activity was increasing. (Tr. 315). On April 12, 2004, Claimant reported left shoulder and low back pain to Dr. Moorad. (Tr. 326). On April 14, 2004, Claimant saw Dr. Hisey who found Claimant appeared to be developing a frozen left shoulder. (Tr. 377).

On April 27, 2004, Claimant was attended by Dr. William Hale, II, complaining of left shoulder pain and stiffness. Dr. Hale noted tenderness, reduced mobility, reduced rotator cuff strength, positive impingement signs, and radiographic evidence of spurring and joint reduction. He attributed Claimant's pain to rotator cuff tendonopathy/contusion and adhesive capsulitis. Surgery was recommended by Dr. Hale. (Tr. 353-354).

On May 24, 2004, Claimant underwent surgery on his left

9

shoulder with decompression and repair of a torn labrum. (Tr. 346-348). Dr. Hale found Claimant to be temporarily disabled on June 1, 2004. (Tr. 351).

On June 7, 2004, Claimant began physical therapy. He exhibited slumped posture, reduced cervical mobility, and elevation, weakness, and reduced mobility in the left shoulder. (Tr. 561-562). However, on July 15, 2004, Claimant informed Dr. Hale that his shoulder pain was nearly gone and was released to work without restrictions. (Tr. 350). On July 22, 2004, Claimant underwent surgery by Dr. Hisey for removal of the instrumentation placed during his thoracic fusion due to reported muscle spasms with diminished reflexes. (Tr. 355-357).

On August 2, 2004, Claimant underwent a consultative examination by Dr. Dennis R. Whitehouse. Dr. Whitehouse did not perform a full range of motion test due to Claimant's recent surgery. He found Claimant to exhibit some reduction in left shoulder mobility and left arm weakness but normal reflexes, straight leg raising, and gait. (Tr. 365-369).

On August 3, 2004, Claimant saw Dr. Hisey who noted Claimant was doing well, would continue physical therapy but would remain temporarily totally disabled. (Tr. 372). Claimant continued physical therapy with good progress. (Tr. 371).

On October 13, 2004, Claimant underwent a functional capacity evaluation. The evaluation revealed Claimant could lift about 20

pounds occasionally and 10 pounds frequently while pushing 34 pounds and pulling 48 pounds.  Claimant was limited in axial rotation, kneeling, standing, walking, climbing stairs, overhead reaching, crouching, and stooping.  He could sit frequently.  He exhibited reduced thoracic mobility, elevated heart rate and blood pressure, stopped treadmill testing after 20 minutes due to pain, and needed frequent breaks to sit during the examination.  (Tr. 573-574).

On October 19, 2004, Claimant saw Dr. Moorad with lower back and left shoulder pain, muscle spasms, and insomnia.  He showed tenderness in his back and shoulder with a decreased range of motion.  He also had poor posture and poor body mechanics.  (Tr. 548-549).  On October 22, 2004, Dr. Hisey found Claimant should be limited to lifting 20 pounds, pushing 34 pounds and pulling 48 pounds.  (Tr. 524).

On November 10, 2004, Claimant saw Dr. John Ellis for a disability examination. He was found to have cervical and thoracic muscle tendon unit strain, a herniated thoracic disk causing cord compression and spinal stenosis requiring multiple surgeries and fusion, adhesive capsulitis of the left shoulder requiring surgery, depression due to chronic pain, and a left eye cataract due to steroid use.  Dr. Ellis found Claimant to be temporarily totally disabled.  (Tr. 56-64).

Through November and December of 2004, Claimant continued to

obtain pain management treatment from Dr. Moorad. (Tr. 550-553). He obtained Flexeril from Dr. Gibbs in February of 2005. (Tr. 415).

On March 2, 2005, Claimant underwent an IME by Dr. Stephen Carella as a part of his worker's compensation case. Claimant was found to have pain and depression, chronic adjustment disorder NOS with a GAF of 60. (Tr. 576-587). On May 5, 2005, Claimant obtained another opinion on his mental status from Dr. David E. Johnson. Dr. Johnson found only mild depression without corresponding anxiety and emotional distress due to pain. His depression was thought to be capable of control through medication and he could work within his physical limitations. (Tr. 588-591).

On May 23, 2005, Claimant was attended by Dr. Ellis for permanent disability evaluation. Dr. Ellis' evaluation remained the same as for temporary total disability.

Claimant's pain continued through January of 2007 with Dr. Gibbs prescribing pain medication including OxyContin.

At the administrative hearing, Claimant testified that he continued to experience wrap around thoracic pain with constant muscle spasms and occasional leg pain. (Tr. 602). He described his left shoulder as 90 percent improved but that he could sit for less than one hour and stand for 15 to 20 minutes at a time due to pain. (Tr. 603-604). He could not lift anything heavier than a gallon of milk, had difficulty squatting and bending. He slept two

to four hours at a time in his recliner and arose with significant pain. (Tr. 604-605, 608).

Claimant continued taking OxyContin but had bad experiences with it. (Tr. 601). He reported difficulties in concentration with his medications. (Tr. 601-603). He stated Dr. Gibbs told him his pain would continue. (Tr. 608). He needed hooks to put his boots on, had to constantly shift in his recliner, and used a walker in the morning to get to the bathroom. (Tr. 603-605, 607). He sometimes needed help getting out of bed, grooming and getting dressed. (Tr. 605-606). He spends his days watching television, sleeping, and attending church twice per week, although he could not sit through an entire service. (Tr. 607-608). Claimant reported he needed two or three breaks per day lasting up to three hours, depending upon if his medication put him to sleep. (Tr. 607).

In his decision, the ALJ found, based upon the testimony of the vocational expert, that Claimant could perform the sedentary jobs of motor vehicle dispatcher and bus/taxi dispatcher. (Tr. 27-28). The ALJ found Claimant suffered from the severe impairments of discogenic and degenerative back disorders and diabetes. (Tr. 21). He further found Claimant retained the RFC to perform sedentary, semi-skilled work. (Tr. 27).

The ALJ rejected Claimant's claims of limitations as not being supported by the medical evidence. He found Claimant's allegations

13

that he could not work due to pain and the effects of pain medications were due largely to the attempts to wean him from the medications being thwarted by Claimant seeking medication from other doctors. (Tr. 26).

It is well-established that "findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995). "Credibility determinations are peculiarly in the province of the finder of fact" and, as such, will not be disturbed when supported by substantial evidence. Id. Factors to be considered in assessing a claimant's credibility include (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. Soc. Sec. R. 96-7p; 1996 WL 374186, 3. An ALJ

cannot satisfy his obligation to gauge a claimant's credibility by merely making conclusory findings and must give reasons for the determination based upon specific evidence. Kepler, 68 F.3d at 391.

The ALJ failed to satisfactorily link his rather abbreviated credibility finding to medical evidence in the record. His finding of pain medication seeking represents an opinion of the ALJ which finds no support in the medical record. Rather, the record indicates the physicians attending Claimant were aware of the other's prescribed medication. Upon remand, the ALJ shall thoroughly review Claimant's limitations and the medical records under the rubric of Kepler and the applicable Social Security Rulings.

### Step Five Evaluation

Claimant also challenges the ALJ's step five analysis, contending he failed to include all limitations in the questioning of the vocational expert. A review of the questioning in the hearing transcript reveals he failed to limit his inquiry of the VE to semi-skilled jobs - an employment limitation he eventually found. As a result, the VE identified skilled positions and semi-skilled jobs together when he identified the number of positions available locally and nationwide. On remand, the questioning shall be more specific and pointed to only include jobs within Claimant's limitations.

**RFC Assessment**

Claimant also contends the ALJ's RFC assessment was deficient because he did not include all of Claimant's limitations. Specifically, the ALJ failed to include Claimant's sitting and standing limitations, and limited reaching with his left shoulder. Claimant states the ALJ should have found he was disabled for a limited period before he achieved improvement from his surgery. On remand, the ALJ should re-evaluate his RFC assessment, considering all of Claimant's limitations supported by medical and evaluative evidence.

**Claimant's Mental Impairments**

Claimant finally asserts the ALJ failed to consider his mental impairments. Medical evidence is contained in the record to support a finding that Claimant suffered from depression, largely brought on by his continuing pain. The ALJ failed to consider depression in his evaluation of Claimant's RFC. On remand, he shall do so.

**Conclusion**

The decision of the Commissioner is not supported by substantial evidence and the correct legal standards were not applied. Therefore, the Magistrate Judge recommends for the above and foregoing reasons, the ruling of the Commissioner of Social Security Administration should be **REVERSED and the matter REMANDED** for further proceedings consistent with this Order. The parties

are herewith given ten (10) days from the date of the service of these Findings and Recommendations to file with the Clerk of the court any objections, with supporting brief.  Failure to object to the Findings and Recommendations within ten (10) days will preclude appellate review of this decision by the District Court based on such findings.

    DATED this 30th day of September, 2008.

                                       KIMBERLY E. WEST
                                       UNITED STATES MAGISTRATE JUDGE